[Civ. No. 388.   Third Appellate District.—November 25, 1908.]

In the Matter of the Estate of BILLINGS M. RICHMOND, Deceased. SAMUEL M. COPPIN,. Executor, Appellant; ELIVA M. FERGUSON et al., Heirs and Legatees, Respondents.

ESTATES OF DECEASED PERSONS—NOTES AND MORTGAGES IN NAME OF EXECUTOR—ASSIGNMENT TO ESTATE—CONCLUSIVE SETTLEMENTS OF ANNUAL ACCOUNTS.—When, in the settlement of an annual account of an executor, investments upon notes and mortgages taken by him in his own name, without an order of court, were reported to the court, and found to be for the benefit of the estate, and were assigned to the estate, so long as they were treated as the property of the estate, the settlements of annual accounts based thereon are conclusive against all persons interested in the estate not under disability.

ID.—SUBSEQUENT INDIVIDUAL RENEWALS—ACCUMULATED INTEREST—PRESUMPTION—LOAN AND MINGLING OF TRUST FUNDS—INTEREST CHARGED IN FINAL ACCOUNT.—When, instead of enforcing collection of the notes and mortgages belonging to the estate, the executor renewed them in his individual name without authority, and added accumulated interest to the principal sums, he thereby presumably surrendered and canceled the old notes and mortgages, and the new ones stood for the loan of the funds of the estate in the amount due the estate, and the taking of them in his individual name without authority of court, and without any assignment to the estate, was in effect a mingling of the trust property of the estate with his own, and he cannot complain of a charge of interest against him, upon

the new principals from the date thereof, including interest on the
accumulated interest made part thereof, on the settlement of his final
account.

ID.—EXPENSE OF PROCURING BOND PRIOR TO ACT OF 1905 —DISALLOW-
ANCE—STATUTE NOT RETROACTIVE—VESTED RIGHTS.—The expense of
procuring and renewing the bond of the executor incurred prior to
the act of March 20, 1905, was properly disallowed by the court in
his final account. That statute cannot be construed as retroactive
in the impairment of prior rights vested at the death of the testator.

ID.—PRESUMPTION AGAINST RETROSPECTIVE OPERATION OF STATUTES.—
It is always presumed that statutes were intended to operate prospec-
tively, and all doubts are resolved in favor of such a construction;
and one cannot be deemed retrospective by implication when not so
expressly declared.

APPEAL from an order of the Superior Court of Sacra-
mento County, settling the final account of an executor.
Peter J. Shields, Judge.

The facts are stated in the opinion of the court.

S. Solon Holl, for Appellant.

P. S. Driver, for Respondents.

CHIPMAN, P. J.—This is an appeal from an order settling
the final account of the executor of the above-entitled estate.
In his account he recapitulates his credits and debits, show-
ing:

Credit ...................................... $24,425.24
Debit ....................................... 22,894.59

Balance due executor from estate.............. $ 1,530.65

In its order, restating the account as settled and allowed,
the court, on January 22, 1906, the date of the decree, found
as follows:

Debit ...................................... $24,426.77
Credit ..................................... 8,700.75

Due the estate from executor................ $15,526.02

The court, in its decree, charges the executor with certain
items for which he took credit in his final account. The items
disallowed as credits and charged as debits are the following:

1. Promissory note secured by mortgage executed by the Sacramento Olive Company, May 6, 1901, for the sum of $9,178.50. The decree charges the executor with interest on the amount of the note at six per cent per annum from its date, less $1,000 collected thereon, making $1,588.34.

2. Also promissory note for $3,753.35, secured by mortgage by the Sacramento Olive Company, dated May 6, 1901. The court made the same order as to this item as to the foregoing item and charged interest from date of the note to the date of the decree, less $180 paid thereon, amounting to $878.44.

3. An item, "March 13, 1905, second installment of taxes on Placer County land," $21.84.

4. Also item, "March 13, 1905, first and second installment, taxes for '04" on Placer county land, $48.92.

5. Item, "Jan. 16, paid on redemption for tax sale made before estate acquired title," Placer county land, $209.35.

6. Item, "November 26, 1900, excess on mortgage tax," Placer county land, $2.93.

7. Certain six items each for $62.50, being cash paid by the executor March 3, 1889, and annually thereafter to March 3, 1904, $375.

8. Item to correct an error in the executor's account filed October 13, 1899, $1,000.

Some other items were contested but the court allowed them. As to these latter, contestants have appealed on separate transcript, No. 389.

In his opening brief appellant calls attention only to the items above enumerated as numbers 1, 2, 7 and 8, and embraced in his appeal, namely: items relating to the Sacramento Olive Company loans; item relating to payments to appellant's bondsman, and item to correct an error in former accounts. In his reply brief appellant addresses himself to contested items in which the court found in his favor. These will be considered in contestant's appeal. Inasmuch as appellant ignores his appeal except as to the items mentioned in his opening brief, we shall follow his example and assume that he has abandoned his appeal as to said items.

1. The items in paragraphs above designated 1 and 2 present the same questions and may be considered together. The grounds of contest were that the executor made the loans in his own name and on his own behalf, without any

order of court, and that the land mortgaged to secure the loans is of less value than the amount loaned. The decree recites that the promissory notes were executed by the Sacramento Olive Company to Samuel M. Coppin May 6, 1901, ''and the amount thereof at that time being the sum of (stating amount of each loan), the money loaned on said note and mortgage being the property of said estate, and loaned by said executor in his individual name without authority of court. . . . Said executor is hereby charged with the amount of said promissory note (stating amount) and six per cent per annum interest thereon from the date thereof until the amount of said promissory note, together with said six per cent per annum interest, shall be paid into said estate,'' less the sums shown as paid thereon.

Appellant's contention, as we glean from his brief, is that the larger of the notes of the Sacramento Olive Company was a renewal of a note previously given by other parties, for loan of money of the estate made by the executor in his own name, without authority of court, which was secured by mortgage upon property subsequently purchased by the Sacramento Olive Company, and payment assumed by that company in the deeds of purchase; that this note and mortgage were made the subject of his annual account by the executor which was allowed and approved, and that the decree of the court was and is conclusive and should be so held as to the renewal note and mortgage; that the smaller note was a direct loan to the olive company secured by mortgage, and was reported in the earlier annual accounts and was settled and allowed; that this note, made in 1901, was a renewal of the former note, and that the decree approving and allowing the earlier account was and is conclusive as to the renewal note and mortgage.

It was said in *Estate of Grant*, 131 Cal. 426, [63 Pac. 731], that ''an order 'settling an account of an executor or administrator' is appealable (Code Civ. Proc., sec. 963, subd. 3); and it is clear that where proper notice has been given it is conclusive as to all items contained in it, except as to persons laboring under some legal disability. It is so expressly provided in section 1637, and has been so declared in numerous cases. (Citing many cases.) In this respect there is no difference between a final account—that is, one made with a view to immediate distribution of the estate—and any

other; the code makes no distinction between them as to appealability, or as to the conclusiveness of orders settling them, except that section 1634 provides that if the account be for a final settlement, accompanied by a petition for distribution, the notice must state those facts and must be for at least ten days.''

It appears that on April 16, 1889, the executor loaned one Frances Williams $5,500 of money of the estate for which Williams gave a promissory note, due one year from date, with eight per cent interest, payable annually, secured by mortgage on 265 acres of land in Placer county.

The executor, also, on August 8, 1889, loaned $1,500 of estate money to A. S. and Sarah Osborn and took their promissory note therefor, due one year after date at ten per cent annual interest, payable quarterly, secured by mortgage on 320 acres in Placer county.

He also loaned of estate money, on May 31, 1889, to T. A. Snider, $3,000, and took his promissory note therefor due one year after date with ten per cent annual interest payable quarterly, secured by property situated in the city of Sacramento. These loans were made by and notes given to the executor in his individual name and without any order of court.

In his annual account filed November 16, 1889, he credited himself with these notes and mortgages. His account was contested as to these loans among other items, but the court found that while irregularly made, without order of court, and with full knowledge that if the money was lost ''he would be responsible for such loss on his official bond,'' yet the court found that the loans ''were, nevertheless, an advantage to the estate; and the executor having executed proper assignments of these mortgages to the estate, he is entitled to be credited in his account with the several sums loaned.''. The account was so allowed and settled. The Osborn and Snider notes are not here involved, and are mentioned because inseparably connected with the annual accounts.

On October 13, 1890, the executor filed his second annual account in which he charged himself with ''cash invested in securities $10,000.00'' (the amount of the three notes above mentioned), and took credit for the notes and mortgages as on hand. This account was settled and allowed by the court on December 1, 1890.

On January 23, 1893, the executor filed another annual account; also an account on October 10, 1895. These accounts all referred to the promissory notes and mortgages above mentioned, and the accounts were settled and allowed.

On July 8, 1898, the executor filed his fourth annual account. In this account he charged himself with interest collected on the Snider note and charged himself with five items of "cash for interest from Olive Co.," dated respectively, April 13, May 4, June 2 and November 18, 1896, and February 10, 1897, aggregating $1,023.64. Following the signature of the order of the judge settling the account is what purports to be a "schedule of property belonging to estate, other than cash, July 6, 1898." In this schedule are mentioned "note and mortgage of Sacramento Olive Co., secured on real estate in Placer County, $7,334.00. Note and mortgage of Sacramento Olive Co., secured on land in Placer County, $3,000.00." It is stated that the Osborn mortgage was foreclosed on land in Placer county and the property bid in by the executor. This is the first mention of the Sacramento Olive Company as a debtor. It does not appear in the account when or under what circumstances these notes and mortgages were executed; nor does it appear upon what notes interest was paid in 1896 and 1897 as charged in the account.

On December 9, 1899, the executor filed his fifth annual account, in which he charged himself with the balance from the last account and interest collected from the Snider note "and interest on note of Sacramento Olive Co., $500.00," but on what note it is not stated. This account was settled and allowed December 22, 1899, and is the last account appearing prior to the final account now here. It makes no mention of any notes and mortgages, nor of any property in the hands of the executor except money amounting to $1,064.04. It is not possible from the accounts themselves to determine when or under what circumstances or by what authority the Sacramento Olive Company became a debtor. The only information given us as to the origin of the two notes and mortgages of this company, found in the present account, is as follows: "Preliminary to stating the final account, it is proper to give a short history of the settlement of the estate." Then follows a statement of what appears from the several annual accounts already noticed. Of the two notes and

mortgages appearing in the schedule of property appended
to the account for 1898 it is explained: That the note and
mortgage of the Olive Company, which at the date of the
schedule, July 6, 1898, amounted to $7,334, were originally
the note and mortgage given by Williams to Coppin in 1889
for $5,500; that the land covered by Williams' mortgage was
purchased by the olive company, "and it assumed the Will-
iams mortgage as part of the purchase money, and by June
14, 1893, the sum amounted to $7,334, for which a new note
and mortgage were given." It is not so stated, but we infer
that this new note and mortgage were given by the olive
company. Of the $3,000 note of the olive company it is
explained that at the date of the schedule, July 6, 1898, it
amounted to $3,000. It is then stated that both notes were
renewed May 6, 1901; that at that date the first of these
notes amounted, principal and interest, to $9,167.50, and for
this sum a new note and mortgage were given; that on May
6, 1904 (the date to which the amount, principal and inter-
est, was computed in the final account), the amount was
$10,817.50, less $1,000 paid July 6, 1904, leaving the amount
now due $9,817.50, as shown in the final account, plus the
interest from May 6, 1904.

Of the $3,000 note, it is explained that a new note and
mortgage were given, May 6, 1901, for $3,753.35, and that
the principal and interest due May 6, 1904, amount to
$4,428.95, as charged in the final account. It is conceded that
these renewals were made by Coppin in his individual name
and without any advice or order or authority of court. How
far this alleged history of these loans may be taken as true
it is not necessary to decide. There is nothing in the record
by way of evidence to confirm these statements except the
meager facts appearing on the face of the accounts, and these
fall far short of doing so. We may, however, assume to be
true, as admissions of the executor, such of the statements as
would justify the conclusion of the court. Out of the con-
fused and tangled and unsatisfactory statements in the ac-
counts and this explanation this much stands out clear
enough: that the original loan to Williams was made in 1889
and was renewed by the olive company, with accumulated
interest, in 1893, and was again renewed, with accumulated
interest, in 1901; that a loan of $3,000 was made directly to
the olive company December 14, 1894, which was renewed

May 6, 1901, with accumulated interest, for $3,753.35, and on May 6, 1904, amounted to $4,248.95, as stated in the final account. The renewals of notes and mortgages were made by the executor in his individual name and without any authority or advice of the court. There is perhaps enough in the accounts to show that the Williams loan was the origin of the larger note and mortgage given by the olive company, and that this loan and also the loan made directly to the olive company were the subject of annual accounts which were settled and allowed. Conceding that under the authorities such settlement became conclusive, we do not think that the decree of the court, December 22, 1889, the date of the settlement of the last annual account, can be held to conclude the court from disallowing the renewals of the old notes and mortgages, with accumulated interest, in 1901. These notes and mortgages are in the individual name of the executor, and have never been assigned to the estate. They are of long standing, with large accumulations of interest. There is no evidence showing why, after the early warning given him in 1889 that he assumed all liability in making loans and taking mortgages without any order of court, he persisted in acting on his own responsibility in renewing these notes in 1901; there is no evidence tending to show any necessity for renewing the notes or that payment could not have been enforced; or that it was to the advantage of the estate to renew rather than enforce collection or foreclose the mortgages. It is quite possible that the facts shown on the hearing of former accounts justified the court in its action, but that an entirely different state of facts existed in 1901, when the executor, on his own motion, assumed to renew these obligations in amounts much larger than the original notes, and that the facts then existing would have led the court to refuse authority to make the renewals. We think the court was justified in charging the executor with these amounts, and was not bound by any previous settlement of the annual accounts.

Appellant also contends that it was error to charge the executor with interest from the date of the notes because he was thus charged with interest on interest, a large part of the notes being accumulated interest. It is claimed that he is not responsible for interest stipulated to be paid, unless he has collected or can collect it. (Citing *In re Moore,* 72 Cal. 335, 344, [13 Pac. 880] ; *Estate of Sarment,* 123 Cal. 331, [55 Pac.

1015], and other cases.)    When the executor took these notes and mortgages in his own name, without any order of court, he became liable to the estate for the amount then by him treated as funds of the estate.    Whether part of this was accrued interest is immaterial; he presumably surrendered the old notes and canceled the old mortgages; the new notes and mortgages stood for the loan of funds of the estate in the amount then due the estate and must be so treated.    In taking them in his individual name and without authority of court it was in effect a mingling of trust property with his own.    It was so held in *Matter of Bane,* 120 Cal. 533, [65 Am. St. Rep. 197, 52 Pac. 852].    It was there said: "A careful review of the cases fails to show any difference in principle where the trustee deposits money to his individual credit and where he invests by note and mortgage in his individual name."    There was no evidence of the value of the mortgaged property when these notes were executed, but it did appear that the value put upon it at the hearing was several thousand dollars less than the amount of the notes when given, to which should be added accumulated interest since May 6, 1904.    We see no error in charging six per cent interest on the amount of the notes.

2. The account showed that the executor had paid out annually $62.50 to American Surety Company as his bondsman. These payments were made prior to 1895 and subsequent to his last annual account.    The court disallowed all these items. The statute of March 20, 1905 (Stats. 1905, p. 477), reads as follows: "Any . . . executor required by law or by order of court to give a bond as such, shall be allowed as part of the lawful expense of executing his trust, the sum paid for such bond, not exceeding, however, one-half ($\frac{1}{2}$) of one (1) per cent of the amount of such bond, for each year that the same shall remain in force."    No ground is stated in the contest for disallowing these items, and in the brief of contestants the only ground suggested is that prior to the passage of the act of 1895 there was no authority of law for paying such expenses.    (Citing 11 Am. & Eng. Ency. of Law, 2d ed., p. 1236.)    It seems to have been conceded that the expense was incurred, but the item was contested and doubtless disallowed upon the ground that the act of 1895 did not apply to such expenses incurred previously to its passage.    We have, then, the question: May the act be given a retrospective ef-

fect? The general rule is that statutes will be construed to operate prospectively only, unless an intent to the contrary clearly appears. It is always presumed that statutes were intended to operate prospectively, and all doubts are resolved in favor of such a construction. (See the numerous cases cited in note to section 642, volume 2, Lewis & Sutherland on Statutory Construction; *Pignaz* v. *Burnett*, 119 Cal. 157, [51 Pac. 48].) And the rule is especially applicable where the statute, if given a retrospective operation, would be invalid, as impairing the obligation of contracts. (*Id.*) Where the statute, if given a retroactive effect, would impair private rights, the rule is stated thus in *Thorne* v. *San Francisco* (*People* v. *Hays*), 4 Cal. 127, 133: "We but concur with the great majority of the judges in England and America, when we assert that it is well established not only as the doctrine of the common law, but as a principle of jurisprudence, that no statute shall be so construed as to give it a retroactive effect; to divest the rights of individuals vested previous to its passage, or previous to the time the act took effect—unless such intention is expressed in terms." The heirs become vested with the title to the property of the decedent immediately upon his death, and the legislature cannot, by a subsequent enactment, interfere with such vested right. (*Estate of Packer*, 125 Cal. 396, [73 Am. St. Rep. 58, 58 Pac. 59].) Whether this principle would protect the heirs against subsequent statutes enlarging the charges which may be made as expenses of administration—such as fees, commissions and other expenses—when incurred after the passage of the act, need not be considered. Nor need we consider the question whether a statute expressly made retroactive, as to such expenditures, would be invalid. The statute before us is not in terms made retrospective, nor is there any language used which would warrant us in holding it so to be by implication. It relates to an expenditure to be paid out of the *corpus* of the estate which before the act could not have been legally allowed. (2 Woerner's American Law of Administration, p. 1247, [2d ed., sec. 514].) It was held in a Pennsylvania case—*In re Miller's Estate*, 13 Pa. Co. Ct. Rep. 137—that there is a distinction between the case where the bond is given in the ordinary course, which every executor and administrator must give before letters will be granted, and where the performance of some duty devolves upon him in the course of

administration—as for sale of real estate, requiring additional bond. But in *Eby's Estate*, 164 Pa. 249, [30 Atl. 124], it was expressly decided that no such distinction could be drawn, and that the expense of procuring bond must be borne by him personally. We understand that such has been the uniform practice in the courts of this state prior to the act of 1905. The bond required of the executor in this case went to his qualifications to act, without which he could not have been commissioned to act. It was voluntarily given and without expectation that any expense attending it would be paid. We do not think we would be warranted in giving retrospective effect to the statute in order to legalize the expense incurred prior to its passage.

3. The only remaining question is the claim that in his annual account filed October 13, 1890, there is an error of $1,000 against him. It sufficiently appears from the account itself, considered with reference to previous accounts, that the executor charged himself with $3,000, the full amount of the Snider note, and also $1,051.20 as principal paid on this note, $51.20 of which was in fact interest. On the credit side of the account the entry is, ''Note and mortgage of Snider, $2,000.00.'' Obviously, he stands charged with $1,000 too much, or credited for $1,000 too little. Respondents invoke the rule as to the conclusiveness of the decree settling the account. But we think an error of this character appearing plainly on the account should be open for subsequent correction. The difficulty we find in coming to the executor's relief is that upon footing up the debits and credits as shown in the record, in that particular account, we find that his footing of credits shows $1,846.95 more than the items correctly footed would warrant. If he were now allowed credit for this $1,000 he would still owe the estate $846.95 on that year's account. If he insists upon his right to correct an apparent clerical error or misprision in his favor, he should be held by a like error against him.

We can discover no reason for disturbing the order as to the items herein considered, and it is therefore affirmed.

Burnett, J., and Hart, J., concurred.